**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| United States of America, | Crim. No. 13-273 (SRN/JJK) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| (2) Moran Oz; | |
| Defendant. | |

---

Linda I. Marks, Esq., and Roger J. Gural, Esq., United States Department of Justice, Consumer Protection Branch, counsel for Plaintiff.

Joseph S. Friedberg, Esq., Joseph S. Friedberg, Chartered; and Robert D. Richman, Esq.; counsel for Defendant (2) Moran Oz.

---

JEFFREY J. KEYES, United States Magistrate Judge

On March 2, 2016, the Court held a hearing in this case concerning Defendant (2) Moran Oz's Motion to Suppress Electronic Surveillance (Doc. No. 364). In Oz's motion, he asserts that the government violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, et seq., and the Fourth Amendment of the United States Constitution when it obtained telephone calls and emails between Oz and the government's informant Paul Calder Le Roux. (*Id.*) Oz contends that Le Roux never voluntarily consented to having phone calls and emails between the two recorded or monitored and seeks to have all the evidence of those calls and emails suppressed. (*Id.*) At the March 2, 2016 hearing, the Court admitted certain exhibits into evidence and heard testimony from three witnesses. Special Agent James E. Stouch and Special Agent Travis Ocken of the Drug Enforcement Agency ("DEA") testified on behalf of the government. Oz called Le Roux as a witness. These witnesses provided evidence relevant to the

issue whether Le Roux voluntarily consented to the monitoring of his emails and phone calls with Oz.

The parties submitted post-hearing briefing concerning the motion. Under 28 U.S.C. § 636 and Local Rule 72.1, this Court now issues the following report and recommendation. Because the totality of the circumstances demonstrates that Le Roux provided his consent to the government's interception of his telephone and email communications with Oz, there has been no showing of a statutory or constitutional violation. Accordingly, Oz's motion to suppress should be denied and the government should not be precluded from using such evidence on grounds that its acquisition violated Title III or Oz's Fourth Amendment rights. This Court also recommends that Oz's motion requesting that the Government be ordered to produce the plea agreement reached by Le Roux and the Government be denied.

## BACKGROUND

In this case, the Government is prosecuting several individuals for maintaining a criminal conspiracy to distribute certain prescription drugs in violation of the Food Drug and Cosmetics Act and the Controlled Substances Act, and for other crimes, in connection with their operation of an online pharmacy known as RX Limited. (Doc. No. 5, Indict.) Oz is among the co-conspirators alleged to have run the business from Israel. (Doc. No. 497, Tr. of Mar. 2, 2016 Hr'g ("Tr.") 88:1–22.) Government agents learned information about the operation of that online pharmacy from Paul Calder Le Roux, an informant who has a history of engaging in international crime.

**I.    Le Roux's Arrest in Liberia and Cooperation with United States Law Enforcement**

Special Agent James E. Stouch of the DEA participated in the investigation of Le Roux for offenses including the distribution of controlled substances. (Gov't's Ex. 1, Dec. 7, 2015

Decl. of Special Agent James E. Stouch ("Stouch Decl.") ¶¶ 1–2 (available at Doc. No. 439-4); Tr. 6:25–7:4.)  By September 2012, Le Roux had been indicted by a grand jury on federal drug conspiracy charges in the Southern District of New York for conspiring to import significant quantities of methamphetamine into the United States.  (Tr. 7:14–23.)   On September 26, 2012, foreign law enforcement officials arrested Le Roux in Liberia.  (Stouch Decl. ¶ 2.)  Le Roux was in Liberia because he was told that a Colombian cartel was interested in setting up a meth lab; in exchange for Le Roux's providing chemicals for the meth lab he would receive a supply of cocaine.  (Tr. 55:4–8.)   He was in Liberia for about a day attempting to have a meeting relating to the chemicals-for-drugs transaction when he was arrested by Liberian officials.  (Tr. 55:9–14.)  Initially Le Roux attempted to bribe the Liberian officials who arrested him, but this strategy was unsuccessful.  (Tr. 16:6–13, 55:18–20.)

The same day he was arrested, Liberian authorities turned Le Roux over to the custody of the DEA.  (Stouch Decl. ¶ 2.)  When Le Roux was transferred to DEA custody, the plan was to place him on a plane the DEA had chartered to transport Le Roux from Liberia to White Plains, New York.  (Tr. 9:21–24; see Stouch Decl. ¶ 2.)  Le Roux was initially uncooperative with the attempt to place him on the chartered plane.  (Tr. 16:14–20.)  "[H]e apologized in advance," but stated that he did not want to get on the plane to New York.  (Tr. 17:16–18:1.)  He initially refused to walk toward the plane and had to be "forcibly moved" onto a van that was transporting him to the plane.  (Tr. 56:2–9.)  His resisting was characterized as providing "dead weight," and "stiffen[ing] up," as well as refusing to "comply with . . . commands."  (Tr. 17:11–15.)  Le Roux was not injured as a result of being forcibly moved.  (Tr. 17:5–10, 56:13–14.)

However, halfway through the trip to the plane, Le Roux "essentially said he was no longer going to resist and that he would cooperate with [the DEA agents'] commands . . . ."

3

(Tr. 18:2–9, 16:14–20.)  Agent Stouch did not know why Le Roux had a change of heart. (Tr. 16:21–23.)  Le Roux admitted, however, that he did not see the point in continuing to resist and accepted the situation he was in.  (Tr. 56:2–6.)  It was "obvious" to Le Roux that he was in a "bad situation" because he had been charged with a crime and was facing criminal charges related to drug trafficking.  (Tr. 56:20–57:4.)  During the plane ride from Liberia to New York, Le Roux offered to cooperate with the DEA.  (Tr. 56:16–19; Gov't's Ex. 3, Dec. 21, 2015 Decl. of Paul Calder Le Roux ("Le Roux Decl.") ¶ 2).)  He wanted to cooperate with the law enforcement to benefit himself in his criminal case in the United States.  (Tr. 57:17–23; Le Roux Decl. ¶ 2.)  Although Le Roux did not know the specific penalties he would be facing on the federal drug charges, he decided to cooperate because he was "aware, as are most people in the world, that the U.S. maintains strict laws on drug matters."  (Tr. 57:5–12.)  When Le Roux volunteered to cooperate, the agents said that they were not in a position to make a deal, which would require the involvement of a prosecutor, but they told Le Roux it would be better for him to cooperate.  (Tr. 57:21–58:4.)

Upon the arrival in New York, an attorney from the Federal Defenders office in New York was appointed to represent Le Roux.  (Tr. 58:18–20, 85:12–14; Le Roux Decl. ¶3.) Le Roux informed his attorney that he wanted to cooperate to benefit himself in his criminal case and a meeting was arranged with Le Roux's attorneys, lawyers from the United States Attorney's Office ("AUSAs"), and DEA agents.  (Le Roux Decl. ¶¶ 3–4; *see* Tr. 10:17–22, 20:22–21:1 (discussing Le Roux's early meetings with government officials).)  At the meeting, Le Roux received a Proffer Agreement that would apply at each meeting he had with DEA agents and the AUSAs, would protect him from having his statements in the meetings used against him, but would not protect him from being prosecuted.  (Tr. 21:1–13.)  Le Roux had at least sixteen

4

meetings under the Proffer Agreement between October 1, 2012 and March 20, 2013. (Doc. No. 493-3, Proffer Agreement 2–3.)

Beyond the methamphetamine distribution charges Le Roux was facing in the Southern District of New York, the Government suspected he was involved in other criminal activity. Agent Stouch was aware, at the time of Le Roux's arrest, that there were other ongoing investigations into Le Roux's conduct. (Tr. 18:10–15.) For example, Agent Stouch knew that Le Roux had been involved in attempting to transport 200 kilograms of cocaine from Ecuador to an uncertain location by use of a yacht. (Tr. 18:16–25.) Several months after Le Roux's arrest, the Government learned that a yacht containing 200 kilos of cocaine had washed ashore off the coast of Tonga, and a person was found on board that yacht who was dead and decomposing. (Tr. 19:1–13.) Agent Stouch also knew that sometime in the year 2009 Le Roux had been involved in a large shipment of assault rifles that was seized in Manila. (Tr. 19:17–22.)

Le Roux's agreement to cooperate with the Government involved his discussion of a wide range of criminal activities he engaged in around the world. (Tr. 65:5–7.) In speaking with federal agents, Le Roux discussed his knowledge concerning several murders, including his role in ordering certain killings to take place. (Tr. 60:2–18 (discussing involvement with several murders); *id.* at 67:3–18 (testimony concerning discussions with agents about a murder); *see id.* 79:6–12 (discussing pleading guilty to a number of different murders that Le Roux either participated in, caused, or solicited).) Le Roux also discussed his involvement in arming individuals in Somalia who were guarding "a property" as a "security team." (Tr. 65:8–66:6.) He explained to agents that he was involved in trafficking a large amount of ammonium nitrate (a fertilizer that can be used in making explosives), intended for the Philippines, that was seized in Hong Kong. (Tr. 67:19–69:1.) Le Roux told agents about a shipment of assault rifles to

Manila that was seized in the Philippines (Tr. 66:21–25), and shipping red phosphorous (a chemical used for manufacturing methamphetamine) to Manila (Tr. 69:2–6.) He discussed how he purchased methamphetamine from an individual who claimed that it was manufactured in North Korea. (Tr. 71:12–25.)

As part of his cooperation with the government, Le Roux assisted the government agents in the investigation of the online pharmacy business which is the subject of this case. (*See* Tr. 22:21–23:22 (discussing Le Roux's efforts to operate the online pharmacy following his arrest and the transfer of funds to do so).) Le Roux's arrest and the fact that he was in government custody was kept secret, and Le Roux engaged in ongoing communication, monitored by the government, with his employees who were operating the business. Le Roux assisted government agents in their investigation by transferring or wiring cash to pay salaries, pay doctors, and other pay for other expenses of the business. (*Id.*; *id.* at 74:18–75:6.) Le Roux would contact others who would handle the transfers, including individuals located in Israel who were running the business. (Tr. 40:14–24, 41:23–42:4, 75:7–9.) Although the government seized some of Le Roux's assets totaling around $300,000, it left other assets untouched, and an unknown amount of these funds were used in the wire transfers for continuing the online pharmacy. (*See* Tr. 42:5–43:11 (discussing seizure of some assets and stating that some money was not seized); *id.* at 75:12–76:11 (discussing the availability of funds for the operation of the online pharmacy but stating that the amounts transferred was not known).) These accounts were located in the Philippines, where Le Roux had "staff" whom he would direct to make the wire transfers for the continued operation of the business. (Tr. 92:21–93:23.)

As a result of Le Roux's cooperation, he has been provided no assurances by any Government agents, but the Government has agreed to make his cooperation known to the court

in New York if he is "truthful and . . . provide[s] information that's of substantial assistance." (Tr. 80:4–9, 72:16–19, 73:5–12.) Le Roux was not threatened or coerced into agreeing to cooperate with the Government, nor were any promises made to induce his cooperation. (Tr. 89:22–90:2 ("No threats have been made. In fact, my treatment has been very good."); *id.* at 90:3–22; *id.* at 12:3–8; *id.* at 13:15–20; *id.* at 48:2–17.)

II.     **Monitoring of Le Roux's Email and Telephone Communications**

As noted above, Le Roux's cooperation in this case also involved allowing the Government to monitor certain email correspondence and telephone calls he had with Oz. It is these communications that are the subject of Oz's pending motion to suppress evidence seized as a result of electronic surveillance.

   A.     **Monitoring of Email Communications**

Before he began cooperating with the investigation, Le Roux had established an email account that he used to communicate with his associates in the online pharmacy business. (Tr. 10:23–11:10.) After he was arrested and agreed to cooperate, he used this email account as part of his cooperation so that he could "maintain the image that he was still free and moving about . . . ." (Tr. 11:3–10, 22:21–25; Le Roux Decl. ¶ 5; Stouch Decl. ¶ 4.) Because Le Roux set up this email account using a private server that would erase or delete messages after a certain period of time, Le Roux assisted DEA agents in creating a separate "mirror" email account that would capture and preserve the email communications he continued sending after his arrest. (Tr. 11:11–12:4: 90:9–13; Stouch Decl. ¶ 6; Le Roux Decl. ¶ 7.) Le Roux was aware that every time an email was sent or received by his account the mirror account would capture that message. (Tr. 11:25–12:2, 12:13–16.)

Le Roux used the email account after his arrest to communicate with his associates who were involved with the online pharmacy operation, including defendants in this case, at the direction of the government. (Tr. 12:9–12, 73:21–74:1.) Occasionally, agents would bring Le Roux a laptop computer he could use to send emails to various defendants. (Tr. 76:12–15.) Before sending a message, he would work out with the government agents what he was going to say with the intent of developing evidence against the defendants. (Tr. 74:2–7.) Some of the emails the government monitored and retained involved communications about payments to physicians and pharmacies associated with the online pharmacy business. (Tr. 88:23–89:2.)

Le Roux was not threatened or coerced by government agents to get him to cooperate in the monitoring of his email communications. (Tr. 12:3–8, 90:9–22; Le Roux Decl. ¶ 9.) Le Roux never objected to the monitoring of his emails. (Tr. 12:17–19.) Le Roux made the decision to cooperate with the monitoring of his emails with the knowledge and advice of his attorneys. (Le Roux Decl. ¶ 9.)

B.   **Monitoring of Telephone Calls**

Le Roux also made telephone calls that the government monitored as part of his cooperation. (Le Roux Decl. ¶ 8.) He made these calls to develop potential evidence of violations of criminal laws of the United States. (Le Roux Decl. ¶ 8.) These calls involved Voice Over Internet Protocol services (which allows voice calls to be made using a computer) and the use of a cellular phone. (Le Roux Decl. ¶ 8.) Le Roux made several of these calls to Oz. (Tr. 90:6–8; Le Roux Decl. ¶ 8.) Between January and March 2014, Le Roux placed at least fourteen calls to Oz as part of the cooperation in this case. (Tr. 45:15–48:25; Gov't's Ex. 2; *see also* Tr. 50:9–18 (explaining that some of the calls on Gov't's Ex. 2 indicate calls to "Ron" which was another name that agents knew Oz used).) DEA Special Agent Travis Ocken was

8

present for each of these calls, and for others he was joined by other investigators, agents, and task force officers. (Tr. 45:24–25.) Oz made the majority of the calls at the United States Attorney's Office in the Southern District of New York, while others took place at the DEA JFK office in New York or at the Hilton JFK in New York. (Tr. 46:3–11.) To make the calls, Special Agent Ocken and the others would ask Le Roux to make recorded telephone calls to Oz, and after Le Roux agreed, he was given a recording device or an earpiece for a recording device and then dialed Oz's phone number. (Tr. 46:20–47:3.) Le Roux was able to identify that he was speaking to Oz during each of these calls. (Tr. 50:15–18.)

Le Roux was not threatened or made any promises by government agents to get him to cooperate in the monitoring of his phone communications. (Tr. 48:2–8, Tr. 90:1–5; Le Roux Decl. ¶ 9.) Le Roux knew the calls were being monitored and recorded. (Tr. 47:4–6.) When he made the calls, Le Roux was not handcuffed. (Tr. 47:10–11.) Special Agent Ocken was not armed during some of these calls, and when he or others were armed, they never drew their weapons during the calls. (Tr. 47:12–22.) Le Roux never refused to make a call or stated he was unwilling to make a call. (Tr. 47:23–48:1.) Le Roux made the decision to cooperate with the monitoring of his phone calls to Oz with the knowledge and advice of his attorneys. (Le Roux Decl. ¶ 9.)

## DISCUSSION

### I. Legal Standards

As noted above, Oz contends that Le Roux did not consent to the interception of Le Roux's phone calls and email communications with Oz. Oz contends that Le Roux's consent to have the government monitor his phone calls and emails with Oz was not voluntary.

9

Section 2511 of Title 18 of the United States Code generally prohibits the intentional interception of communications through electronic means. *See* 18 U.S.C. § 2511(1). However, the statute also allows the government to intercept a wire, oral, or electronic communication if a party to that communication has given his advance consent. 18 U.S.C. § 2511(2)(c) ("It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."); *United States v. Simmons*, No. 94–1538, 1995 WL 15384, at *2 (8th Cir. 1995) ("[W]hen . . . a law enforcement officer or informant participates in a conversation and records the conversation without prior judicial authorization, the evidence is admissible.") (unpublished table decision) (citing *United States v. White*, 401 U.S. 745, 751–53 (1971), and *United States v. Jones*, 801 F.2d 304, 215 (8th Cir. 1986)). "Nor does such an interception [involving advance consent from a participant] violate the Fourth Amendment." *United States v. Corona-Chavez*, 328 F.3d 974, 978 (8th Cir. 2003) (citing *United States v. White*, 401 U.S. 745, 753 (1971)); *United States v. Kirk*, 534 F.2d 1262, 1272 (8th Cir. 1976) ("It is well settled that a defendant's Fourth Amendment rights are not violated when the defendant's conversations with a government informant are recorded with the consent of the informant.").

"The government bears the burden of proving consent." *Corona-Chavez*, 328 F.3d at 978 (citing *United States v. Gomez,* 900 F.2d 43, 44 (5th Cir. 1990)). "The voluntariness of the consent is examined under the totality of the circumstances." *Id.*

## II. Analysis

### A. Oz Voluntarily Consented To The Government's Interception of Electronic Communications.

Oz argues that the evidence of his email and phone communications with Le Roux must be suppressed because Le Roux did not voluntarily consent to the government's electronic monitoring that captured the emails and recorded the calls. (*See* Doc. No. 364 ¶ 3; Doc. No. 501, Oz's Post-Hr'g Mem.)

The unrebutted evidence here leads unavoidably to the conclusion that Le Roux voluntarily consented to the monitoring of his emails and telephone calls. Le Roux, Agent Stouch, and Agent Ocken all testified that Le Roux agreed to cooperate. They testified that Le Roux agreed to do so without any threats being made and under circumstances suggesting that there was no government coercion. Le Roux faced no physical threats or intimidation when he agreed to cooperate. There was no evidence suggesting that Le Roux agreed to cooperate as a result of being "forcibly moved" when he initially refused to get on the plane, and Le Roux was not injured as a result of being moved. The evidence established that neither Agent Stouch nor Agent Ocken (nor any other law Government agent) made any promises to Le Roux to get him to cooperate. And Le Roux agreed to the email monitoring and the call recording with the advice of his attorneys.

Further, all three witnesses testified at the hearing that Le Roux was aware that his emails and phone calls were being monitored and recorded, and they consistently testified that he agreed to go forward with both forms of communication with Oz. The fact that Le Roux went ahead with the communications at issue while he was aware his phone conversations were being recorded and his emails were being monitored and preserved by the Government is sufficient to establish that he consented to the Government's interception of those electronic communications.

11

*United States v. Diaz*, 685 F.2d 252, 254 (8th Cir. 1982) (concluding that testimony of law enforcement officer that informant agreed to call the defendant on the phone while knowing that the conversation would be monitored and recorded was sufficient to establish consent); *United States v. Kirk*, 534 F.2d 1262, 1272–73 (8th Cir. 1976) (concluding that it is normally sufficient for the government to show that the informant went ahead with the call after knowing the call was being monitored and taped).

As noted above, Oz acknowledges that evidence Le Roux received promises of leniency in exchange for his cooperation is not alone sufficient to undermine the voluntariness of his consent. At the hearing, Le Roux testified that he received no promises or assurances of any kind, but has an agreement with the government that if he provides substantial assistance, the government will make this known to the court when Le Roux is to be sentenced based upon a guilty plea he entered to charges he faced in the Southern District of New York. Nevertheless, Oz suggests that because Le Roux told the Government about his involvement in a range of serious international criminal conduct for which he could have faced serious consequences in the United States and abroad, this somehow vitiates his consent. (Oz's Post-Hr'g Mem. 2 (noting that promises of leniency are typically insufficient to vitiate consent, but arguing that "[t]his case goes far beyond what is typical").) Oz offers no support for the proposition that an informant's consent is less likely to be voluntary when he faces atypically serious consequences and agrees to cooperate in exchange for more lenient treatment by the government than he would receive if he did not cooperate. There is no reason in this case or on these facts to deviate from the well-established rule that an informant's consent is not rendered involuntary merely because he receives a benefit in exchange for aiding law enforcement in an investigation. *See United States v. Oslund*, 453 F.3d 1048, 1056–57 (8th Cir. 2006) (noting that even if an informant had received

promises of lenient treatment for any charges he faced, it would not necessarily have invalidated the informant's consent); *United States v. Rich*, 518 F.2d 980, 985 (8th Cir. 1979) ("The fact that Walsh became a government informant in exchange for a promise of immunity from prosecution in no way diminishes the voluntariness of his 'consent' to the monitoring of his conversations with the defendants and other alleged conspirators."); *see also United State v. Kelly*, 708 F.2d 121, 125 (3d Cir. 1983) ("An individual's decision to allow the police to record a . . . conversation . . . is not necessarily involuntary just because the individual's motives were self-seeking, or because he harbored expectations of personal benefit.").

For all these reasons, this Court concludes that Oz's motion to suppress evidence obtained through the government's electronic surveillance should be denied.

**B.     Oz Has Not Shown That He Is Entitled To Le Roux's Plea Agreement.**

Oz raises two issues concerning Le Roux's plea agreement with Government; (1) he filed a motion asking the Court to order the government to produce Le Roux's plea agreement and any transcript of his plea hearing because "[i]t is impossible to challenge [Le Roux's] testimony [at the suppression hearing] without the plea agreement itself" (Doc. No. 500); and (2) he argues in support of his motion to suppress the email and phone call evidence discussed above that Le Roux's testimony that he was given no assurances regarding extradition to the Philippines or prosecution for his many other criminal acts cannot be corroborated without reviewing the plea agreement he entered with the government (Oz's Post-Hr'g Mem. 2 & n.2). Oz offers no support that he is entitled to production of the plea agreement in either his motion or in his post-hearing memorandum. Oz's request for the plea agreement is based purely on speculation that Le Roux's testimony about the terms of his plea agreement at the hearing was untruthful. However, there is no basis in the record to conclude that Le Roux's voluntary decision to cooperate was

even influenced by the plea agreement's terms. The unrebutted evidence at the hearing established that Le Roux agreed to cooperate before he even arrived in New York following his apprehension in Liberia. He explained that he agreed to cooperate because he already knew his situation was dire based on the charges against him for trafficking in controlled substances. Under these circumstances, the Court concludes that production of Le Roux's plea agreement is unnecessary for resolution of the motion to suppress evidence obtained by electronic surveillance.

## RECOMMENDATION

For all these reasons, **IT IS HEREBY RECOMMENDED** that

1. Defendant (2) Moran Oz's Motion to Suppress Electronic Surveillance (Doc. No. 364) be **DENIED**; and

2. Defendant (2) Moran Oz's Motion To Produce Le Roux Plea Agreement (Doc. No. 500) be **DENIED** to the extent Oz seeks production of the plea agreement to facilitate his suppression motion.

Date: March 22, 2016

    s/ Jeffrey J. Keyes
JEFFREY J. KEYES
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.