# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### Criminal No. 13-00273(2) (SRN/FLN)

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **MORAN OZ;** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

Jacqueline Blaesi-Freed, Linda I. Marks, U.S. Department of Justice, Consumer Protection Branch, 450 5th St. NW, Ste. 6400, Washington, DC 20001, Roger J. Gural, U.S. Department of Justice, Civil Division, P.O. Box 386, Washington, DC 20044 and Vijay Shanker, U.S. Department of Justice, Criminal Division, 950 Pennsylvania Ave., NW, Rm. 1264, Washington, DC 20530 for the United States of America.

Joseph S. Friedberg, Joseph S. Friedberg, Chartered, 701 4th Ave. S., Ste. 300, Minneapolis, MN 55415 and Robert D. Richman, P.O. Box 16643, St. Louis Park, MN 55416 for Defendant Moran Oz.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on acquitted-Defendant Moran Oz's Motion for Attorney's Fees and Expenses Under the Hyde Amendment ("Oz's Mot.") [Doc. No. 947]. For the reasons set forth below, Oz's Motion is denied.

## I.   INTRODUCTION

On March 7, 2017, after nearly four weeks of trial and at the conclusion of the Government's case, this Court granted Defendant Moran Oz's ("Oz") Motion For A Judgment of Acquittal under Federal Rule of Criminal Procedure 29 and ordered that he be acquitted of all charges against him.  (*See* Trial Tr. Vol. 19 dated 3/7/2017 at 3055–59[1] [Doc. No. 1020].)   Specifically, the Court found that even under Rule 29's demanding standard, Oz met the burden of establishing that the Government had failed to introduce sufficient evidence that would allow the jury to find beyond a reasonable doubt that Oz possessed the intent—or mens rea—required to convict him on any of the charges.  (*See id.* at 3056–58.)  Now, Oz asks that this Court order the Government to reimburse him his attorneys' fees and other costs pursuant to the Hyde Amendment, 18 U.S.C. § 3006A, note, arguing that the Government's prosecution was frivolous, vexatious, or in bad faith.

The ruling of a sister court aptly summarizes the challenge of receiving an award of fees under the Hyde Amendment:

> Defendant, an innocent man, faces financial hardship because of the Government's unsuccessful prosecution of him.  Even the slightest empathy produces a sense of unfairness; but subjective fairness cannot guide the Court.   This Court must remain anchored by the law as enacted by Congress.  It is duty bound to follow that law even if the consequences are harsh.  That law is clear.  Congress has decided that, except in a rare case of prosecutorial misconduct, a citizen must bear the legal cost of an acquittal.  The narrow exception to this principle, carefully carved out by Congress, allows a defendant to recover his costs of a successful defense only if he

---

[1] For all transcripts, the Court cites to the page numbers as they appear in the transcript itself.

proves that the Government's prosecution was frivolous, vexatious, or in bad faith.

*United States v. Shelnutt*, No. 4:09-CR-14 (CDL), 2010 WL 1223943, at *1 (M.D. Ga. Mar. 19, 2010).

At the hearing on Oz's Motion, the Government conceded that it made many mistakes during this prosecution that ultimately caused it to "implode" at trial. Even "innocent" mistakes—those that result from inexperience or negligence rather than affirmative misconduct—carry real and serious consequences when they involve the immense prosecutorial might of the United States. Here, Oz was uprooted from his native country, incarcerated for several months, forced to live in the United States for more than two years while subject to intrusive monitoring, and spent hundreds of thousands of dollars on his legal defense.

However, the standard for awarding fees under the Hyde Amendment is onerous. It allows for an award only under limited circumstances that do not include prosecutorial mistakes, inexperience, or even poor judgment. The Court is duty-bound to follow the law and does so here, holding that although this case presents a close call, Oz has not produced evidence of the sort of frivolous, vexatious, or bad faith conduct that would allow for an award of fees.

## II.    BACKGROUND

The facts of this case have been set forth at length in the previous orders of this Court. They are briefly recounted here only to the extent necessary to rule on Oz's Motion.

**A. The Government's Investigation and the Charges Against Oz**

This case was the result of a years-long, global investigation by the Government into an online pharmacy known as RX Limited ("RXL"). *United States v. Oz*, No. 13-cr-273 (SRN/FLN), 2017 WL 480389, at *1 (D. Minn. Feb. 3, 2017). The Government alleged that RXL amounted to a conspiracy to illegally distribute prescription drugs over the internet. *See id.* The Government had evidence that RXL distributed large amounts of prescription drugs using a series of websites. Customers filled out medical questionnaires on the websites, those questionnaires were purportedly reviewed by American doctors (in some instances, individuals without medical licenses approved prescriptions) who wrote prescriptions, and those prescriptions were filled by American pharmacies and mailed to the customer. The Government alleged that these practices did not comport with the requirements of various federal statutes—namely that the customers and doctors did not have the necessary physician-patient relationships and that a controlled substance, in the form of a prescription drug called Fioricet, was dispensed through this process without the necessary licenses and registration. (*See generally* Indict. [Doc. No. 5].)

RXL was run by Paul Calder Le Roux ("Le Roux")—a wealthy, self-confessed murderer, international drug dealer, arms trafficker, and computer hacker—who oversaw a multi-faceted international criminal enterprise. *See Oz*, 2017 WL 480389 at *1. Le Roux pled guilty to numerous charges—including misbranding drugs, mail and wire

4

fraud, and conspiracy stemming from his involvement with RXL—on separate indictments in the Southern District of New York. *Id.* Le Roux was not a defendant in this matter and the Government did not call him as a witness at trial—a decision that created numerous evidentiary issues related to key pieces of evidence.

Oz, an Israeli citizen, joined an internet pharmacy company incorporated in Israel in 2005. *Id.* at *2. This company was not immediately identifiable as part of RXL, Oz believed it was a legitimate business (like many other similar internet pharmacy operations in Israel), and at first he was not aware of Le Roux's involvement with the company. *Id.* Oz would later meet Le Roux and come to understand that Le Roux controlled not only this Israeli company, but RXL as a whole. *See id.* However, their relationship soured in 2009 after Le Roux allegedly lured Oz to the Philippines, had his hitmen take Oz out on a boat, throw him in the ocean, threaten to kill him, and shoot at him in the water, all because Le Roux suspected Oz was being "disloyal." *Id.* at *2–3. Although Le Roux did not ultimately kill Oz, he allegedly threatened Oz's family and took numerous steps to "remind" Oz of his ability to harm Oz and his family anywhere in the world. *Id.* at *3. Remarkably, Le Roux did not deny much of Oz's story and even confirmed some details of it to the Government and the Court, as did one of the alleged hitmen who participated in throwing Oz off the boat. Oz planned to call Le Roux and the hitman at trial and present this evidence as part of his duress defense. Of course, when the Court granted his Rule 29 motion, that defense became moot.

The Government viewed Oz as Le Roux's "go to" lieutenant who oversaw most of the day-to-day operations of RXL, including recruiting doctors and pharmacists,

payments to vendors, and efforts to secure and maintain relationships with shippers. (*See* Gov't's Mem. in Opp. to Oz's Application For Attorney's Fees ("Gov't's Mem. in Opp.") at 7–8 [Doc. No. 989].) The Government also believed that Oz was intimately familiar with RXL's operations and practices and knew—or should have known—that those practices consisted of conduct that violated the Food, Drug, and Cosmetics Act ("FDCA") and Controlled Substances Act ("CSA"). (*See id.* at 9–27.) In contrast, Oz portrayed himself as a sort of middle-management information technology and operations employee, one with no medical training or background and who worked for RXL after 2009 only under duress. Most importantly, Oz averred that at all times he genuinely believed that RXL was complying with the requirements of the FDCA and CSA and had no idea that Fioricet was a controlled substance. (*See* Oz's Mem in Supp. of Application for Attorney's Fees ("Oz's Mem. in Supp.") at 30–31 [Doc. No. 948]; Oz's Reply to Gov't's Opp. ("Oz's Reply") at 10–26 [Doc. No. 1032].) Of course, the pertinent inquiry is whether evidence supported the Government's theory of Oz's involvement with RXL and his resulting intent and knowledge. This issue is discussed in-depth below.

In 2012, Le Roux was arrested in Liberia and extradited to the United States as part of a sting orchestrated by the Drug Enforcement Agency ("DEA"). *United States v. Oz*, No. 13-cr-273 (SRN/JJK), 2016 WL 2595963, at *1–2 (D. Minn. Mar. 22, 2016), *report and recommendation adopted sub nom. United States v. Moran Oz*, No. 13-cr-273 (SRN/JJK), 2016 WL 1948874 (D. Minn. May 3, 2016). He quickly began cooperating with the Government, in relevant part assisting with its ongoing investigation of RXL. *Id.* at *3. For a time, this included Le Roux continuing to finance and direct RXL's

operations.  *Id.*  However, Le Roux ultimately stopped financing and communicating with RXL, after which the company ceased operations.

In 2013, as part of his cooperation with the Government, Le Roux contacted Oz—who was living in Israel—and offered to give Oz money to pay severance packages for the recently terminated Israeli employees of RXL.  Oz agreed to meet Le Roux in Romania to collect this money.  Shortly after Oz arrived, he was arrested by Romanian officials at the behest of the DEA.  Oz was held in a Romanian jail for nearly four months before he was extradited to the United States.  Once in the United States, Oz was detained for an additional month before he was released, but remained subject to strict limitations, including an initial period of house arrest followed by GPS monitoring and a curfew that continued through trial.

Oz was charged with 83 counts related to his involvement with RXL, including misbranding under the FDCA, distribution of a controlled substance and online sale of a controlled substance under the CSA, mail and wire fraud, and conspiracy counts.[2]  (*See* Indict.)  Each count, other than those for conspiracy, was premised on a controlled-buy conducted by DEA investigators.   For each buy, the Government charged Oz with five counts: misbranding, mail fraud, wire fraud, distribution of a controlled substance, and online sale of a controlled substance.  The Government dismissed some of the charges against Oz prior to trial for a variety of reasons, including its conclusion that some of the charges were multiplicitous or should be dropped in the interest of justice.  (*See* Gov't's Mots. to Dismiss [Doc. No. 395, 703].)

---

[2] Ten other Defendants were charged on the same Indictment with Oz.

### B. Pre-Trial Arguments

Before trial, Oz moved to dismiss the charges against him in part based on the contention that Fioricet was not a controlled substance. *See United States v. Oz*, No. 13-cr-273 (SRN/JJK), 2016 WL 1183041, at *2 (D. Minn. Mar. 28, 2016). Fioricet is a controlled substance as defined by the CSA because it contains butalbital, which is a derivative of barbituric acid, which is listed as a Schedule III controlled substance. *Id.* Neither Fioricet nor butalbital are actually listed as controlled substances. *See* 21 U.S.C. § 812, Schedule III, Part (b)(1). The crux of Oz's argument was that a DEA regulation, 21 C.F.R. § 1308.32 (hereinafter, the "Exempting Regulation"), exempted Fioricet from treatment as a controlled substance under the CSA. *Oz*, 2016 WL 1183041 at *3. The Court disagreed and held that the Exempting Regulation applied solely to certain administrative provisions of the CSA and that Fioricet remained a controlled substance subject to the criminal provisions of that statute. *See id.* at *4–6.

The Court also held that the Exempting Regulation did not make the CSA unconstitutionally vague. *See id.* at *6–7. One reason for the Court's holding was that the CSA contained a scienter requirement (sometimes referred to as mens rea or intent), which mitigated against any risk of vagueness. *Id.* at *7. Of course, confusion surrounding the scope of the Exempting Regulation could affect whether Oz had the requisite intent to violate the CSA. For instance, Oz might have relied on representations by others, including medical professionals, that Fioricet was not a controlled substance—

representations made at least in part based on confusion regarding the effect of the Exempting Regulation. It appears that the Government failed to appreciate the significant detrimental impact such evidence would have on its case, as shown through its subsequent filings and arguments.

Shortly before trial, the Government moved to exclude any evidence regarding Oz's mistaken belief that his conduct was lawful. *United States v. Oz*, No. 13-cr-273 (SRN/FLN), 2017 WL 410534, at *1 (D. Minn. Jan. 30, 2017). The Government asked that the Court exclude any argument or testimony "attempting to establish defendants did not specifically know their actions violated the law." *Id.* It made a more specific request that evidence of Oz's mistaken belief that Fioricet was not a controlled substance—based on the Exempting Regulation—be prohibited. *Id.* Tellingly, the Government argued that the CSA "only requires that [it] prove the defendants knowingly distributed Fioricet, not that the defendants knew Fioricet was a controlled substance." *Id.* at *2 (alteration in original). Oz vigorously opposed this motion, arguing that the Government had to prove that he intended to defraud or mislead (for the FDCA and mail and wire fraud charges) and that he knew Fioricet was a controlled substance. *Id.* at *1.

The Court granted the Government's motion in part and denied it in part. Recognizing the axiom of criminal law that "[i]gnorance of—or a mistaken understanding about—the law is not a defense to criminal prosecution," the Court excluded evidence that Defendants were unfamiliar with the requirements of the FDCA or CSA, or that they did not know Fioricet was a controlled substance because of their mistaken beliefs about the effect of the Exempting Regulation. *See id.* at *2, 5.

9

However, the Court categorically rejected the Government's understanding of the CSA's intent element. *See id.* at *2–4.

The CSA and controlling case law clearly required that "the Government prove that Defendants knew they were dealing with a controlled substance, although it need not prove that they knew precisely what the substance was, or that it was specifically listed as a controlled substance." *Id.* at *2. The Court further explained that "the fact that Fioricet is a controlled substance does not conclusively establish that Defendants *knew* its status as such. Fioricet is not a 'notorious' controlled substance—like heroin or cocaine—such that any reasonable individual would understand it to be controlled merely by knowing the identity of the drug." *Id.* at *4 (emphasis original). This allowed Oz to argue and present evidence at trial that he, and others, were not aware of Fioricet's controlled status—so long as the Exempting Regulation was not specifically mentioned. The Court also detailed how the Government had misconstrued the scope of *McFadden v. United States*, 135 S. Ct. 2298 (2015)—which addressed the standard for intent in the context of so-called analogue drugs under the Controlled Substances Analogue Act—and why that case was not controlling. *See id.* at *3–4.

What the Court, and perhaps the Government, failed to appreciate at the time was how the Government's misguided assumptions about its burden to prove mens rea had significantly influenced its investigation and prosecution of those associated with RXL. For instance, there was evidence at trial that one of Oz's alleged co-conspirators, Dr. Anu Konakanchi, pleaded guilty—under a separate information and before another court—to conspiracy to distribute controlled substances despite explicitly stating during her plea

colloquy that she did not know or believe that Fioricet was a controlled substance. These incorrect assumptions, along with other mistakes, would ultimately doom the Government's case against Oz.

### C. Trial

The Government noticed literally hundreds of exhibits—consisting of hundreds of thousands of pages—and dozens of witnesses for trial. However, at trial, it successfully introduced only a fraction of these exhibits and called only some of its witnesses. In particular, the Government struggled to overcome evidentiary issues related to authenticity, foundation, and hearsay for many of its proposed exhibits. Oz's defense counsel—two accomplished criminal defense attorneys with decades of experience— were especially adept at identifying and arguing these evidentiary issues.

Oz's attorneys were also able to introduce and highlight exculpatory evidence, such as emails wherein Oz repeatedly averred to others that RXL was not dispensing controlled substances, received assurances from doctors that this was in fact true, and represented that RXL was careful to conform with federal and state prescribing laws (and again received assurances that this was true from doctors, pharmacists, and others). Notably, there was evidence that RXL stopped dispensing Soma, a top-selling prescription drug on RXL's websites, as soon as it was classified as a controlled substance by the DEA in late 2011. Approximately half-way through its case— presumably recognizing that it could not prove that Oz knew Fioricet was a controlled substance—the Government moved to dismiss the CSA charges against him. (Gov't's Mot. to Dismiss [Doc. No. 858].)

Ultimately, the Court granted Oz's Rule 29 motion and acquitted him of the remaining charges. In doing so, the Court relied heavily on *United States v. Lovern*, 590 F.3d 1095 (10th Cir. 2009), a case with marked similarities to the instant matter. There, now-Associate Justice Neil Gorsuch wrote for the Tenth Circuit and overturned the CSA convictions of a defendant ("Barron") who was a computer technician—with no medical training—at a pharmacy that filled prescriptions for an online service much like RXL. *See Lovern*, 590 F.3d at 1097–99.

> The theories of liability under the CSA[3] the government pursued in its indictment and at trial required it to show that . . . Mr. Barron knew the prescriptions [he] helped fill . . . were issued by . . . physicians acting outside the usual course of professional medical practice or with a legitimate medical purpose. But the government's proof, while it showed many things, failed to include direct or circumstantial evidence that Mr. Barron possessed this particular mens rea.

*Id.* at 1104 (citation omitted). The court found that Barron knew little, if anything, about the fact that the prescriptions he helped fill were the product of an online questionnaire (with no face-to-face meeting between the physician and patient), or that issuing a prescription on this basis was inconsistent with usual medical practices. *Id.* at 1104–05. Although there was circumstantial evidence that Barron knew there was something "fishy" going on—and even that the pharmacy might be violating state laws—that evidence did not satisfy the specific mens rea requirement for a CSA conviction. *See id.* at 1105–08. The Government's evidence against Oz—or lack thereof—bore a striking resemblance to that in *Lovern* and necessitated acquitting Oz of the remaining charges.

---

[3] To convict Oz on the FDCA charges, the Government had to prove that Oz knew the prescriptions generated through RXL were outside the usual course of professional medical practice or lacked a legitimate medical purpose. *See Oz*, 2017 WL 410534 at *2.

## III.   DISCUSSION

### A.  Legal Standard

#### 1.  Legislative History of the Hyde Amendment

In 1997, Congress considered an amendment to that year's appropriations bill that would allow for acquitted defendants to recoup their fees and costs under certain circumstances.  *See* 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997).  The initial draft of the amendment—championed by Congressman Henry Hyde—allowed for such reimbursement upon a finding that the prosecution lacked "substantial justification."  *See id.*  Congressman Hyde explained the purpose behind the amendment as follows:

> I have learned in a long life that people do get pushed around, and they can be pushed around by their government.  I was very late coming to that decision, but I learned that people in government, exercising government power are human beings, like anybody else, and they are capable of error, they are capable of hubris, they are capable of overreaching, and yes, on very infrequent occasions they are capable of pushing people around.  And so when something like that happens, it is doubly shocking because you have no place to turn.  If the Government, your last resort, is your oppressor, you really have no place to turn.

*Id.*

Foreshadowing later developments, some Representatives opposed the amendment out of fear that it would penalize prosecutors who pursued cases in good faith based on evidence that was later suppressed or became unavailable.  *Id.* at H7793.  One Congressman even suggested that the standard be changed to allow for reimbursement of fees only where the acquitted defendant could show that the prosecutor was malicious or abusive.  *Id.* at H7792.  Congressman Hyde did not flatly reject or adopt this proposal, but described the conduct the amendment was intended to address as follows:

> What if Uncle Sam sues you, charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong. They are not just wrong, they are willfully wrong, they are frivolously wrong. They keep information from you that the law says they must disclose. They hide information. They do not disclose exculpatory information to which you are entitled. They suborn perjury. They can do anything. But they lose the litigation, the criminal suit, and they cannot prove substantial justification.
>
> …
>
> What is the remedy, if not this, for somebody who has been unjustly, maliciously, improperly, abusively tried by the Government, by the faceless bureaucrats who hire a law firm or get a U.S. attorney looking for a notch on his gun.

*Id.* at H7791, H7792.

The amendment passed the House of Representatives with the substantial justification standard intact. *See* 143 Cong. Rec. H7849-01, H7849 (Sept. 25, 1997). However, it met stiff resistance from the Clinton Administration, Department of Justice, and many members of the Senate. *See United States v. Gilbert*, 198 F.3d 1293, 1301 (11th Cir. 1999). The Senate rejected the amendment passed by the House and in Conference Committee revised the language to what would ultimately become the law. *See* Pub. L. No. 105-119, 11 Stat. at 2519. The Hyde Amendment reads in relevant part:

> [T]he court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) . . . *may* award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, *where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust.*

*Id.* (emphasis added).

## 2. Case Law on the Hyde Amendment

Since enactment of the Hyde Amendment, the courts have made clear that it presents an onerous standard. "The intent of the Hyde Amendment is to deter prosecutorial misconduct, not prosecutorial mistake. Requiring proof of prosecutorial misconduct thus means that a defendant seeking to prove entitlement to a Hyde Amendment award faces a daunting obstacle." *United States v. Monson*, 636 F.3d 435, 439 (8th Cir. 2011). "The Hyde Amendment does not require excellence—it targets prosecutorial misconduct, not prosecutorial mistake. Mere 'faulty judgment' is not vexatious, frivolous, or in bad faith." *United States v. Capener*, 608 F.3d 392, 402 (9th Cir. 2010); *see United States v. Knott*, 256 F.3d 20, 29 (1st Cir. 2001) (holding that the Hyde Amendment is limited to "cases of affirmative prosecutorial misconduct rather than simply any prosecution which failed"). Thus, courts have routinely denied motions for fees despite being highly critical of the prosecution. *See, e.g., United States v. Manchester Farming P'ship*, 315 F.3d 1176, 1183–84 (9th Cir.), *opinion amended on denial of reh'g,* 326 F.3d 1028 (9th Cir. 2003) (denying fees despite finding that the government's conduct was "less than laudable," "below desirable standards," and amounted to "deliberate indifference"); *Knott*, 256 F.3d at 33 (denying fees despite finding that "the government might have handled itself better in some of these instances"); *United States v. Morris*, 248 F. Supp. 2d 1200, 1202 (M.D. Ga. 2003) (denying fees despite finding "the Government's prosecution [to be] disappointingly weak" and describing its trial performance as "embarrassingly disorganized and feeble"); *United States v. Fazzio*, No. CRIM.A. 11-157, 2013 WL 3334956, at *3 (E.D. La. June

24, 2013) (denying fees despite acknowledging that the prosecution "could also be accused of sloppiness, if not confusion"); *United States v. Manfredi*, No. CIV. S 06-416 FCD, 2008 WL 686859, at *10–11 (E.D. Cal. Mar. 11, 2008) (denying fees despite describing the government's performance as "below desirable standards" and "unorthodox").

The Court must consider the prosecution as a whole when deciding whether it was vexatious, frivolous, or in bad faith. *United States v. Manzo*, 712 F.3d 805, 810 (3d Cir. 2013); *United States v. Heavrin*, 330 F.3d 723, 730 (6th Cir. 2003). The terms "vexatious," "frivolous," and "in bad faith" are used disjunctively in the Hyde Amendment and thus each is an independent basis upon which an award of fees may be based. *Monson*, 636 F.3d at 438–39.

### B. Vexatious or Bad Faith Prosecution

Oz argues that the Government's prosecution against him was vexatious and in bad faith. (Oz's Mem. in Supp. at 24–37; Oz's Reply at 33–40.) In support, he highlights the following: (1) the fact that the Government used Le Roux, a dangerous criminal who had terrorized Oz before, to "lure" Oz out of Israel where Oz contends the Government would have had difficulties extraditing him; (2) the fact that Oz was unnecessarily detained for several months—first in Romania and later in the United States—and only released before trial subject to terms that Oz claims were unduly harsh, but which the Government repeatedly supported; (3) the fact that Oz was charged with five separate counts for each controlled buy, which Oz claims the Government did in an attempt to force him to take a plea; (4) the fact that the Government pursued its

prosecution despite having a DEA legal memorandum detailing why prosecuting someone for dispensing Fioricet under the CSA would be difficult; and, (5) comments made by the Government during its opening statement that purposely misrepresented the evidence presented at trial.

"A prosecution is vexatious if it is without reasonable or probable cause or excuse." *Monson*, 636 F.3d at 439. To conclude that a prosecution was vexatious, the Court must find that the Government had an improper motive, such as intending to harass or annoy Oz through its prosecution. *See United States v. Bowman*, 380 F.3d 387, 390–91 (8th Cir. 2004); *Manzo*, 712 F.3d at 811; *Heavrin*, 330 F.3d at 729; *Knott*, 256 F.3d at 29 ("a determination that a prosecution was 'vexatious' . . . requires both a showing that the criminal case was objectively deficient, in that it lacked either legal merit or factual foundation, and a showing that the government's conduct, when viewed objectively, manifests maliciousness or an intent to harass or annoy"). Similarly, bad faith requires a finding that the Government "had a subjective dishonest purpose or moral obliquity." *Manfredi*, 2008 WL 686859 at *10. Again, "mere bad judgment or negligence" does not amount to bad faith or vexatiousness. *Id.*; *see United States v. Ali*, No. 06-CR-200 (ENV), 2008 WL 4773422, at *10 (E.D.N.Y. Oct. 27, 2008) ("Of course, 'misguided', on the one hand, and 'frivolous or vexatious', on the other, are two very different concepts.").

The Court has carefully reviewed the record and cannot conclude that the Government acted vexatiously or in bad faith while prosecuting Oz. *See Ali*, 2008 WL 4773422 at *15 (holding that while a court must carefully review the record, it need not

17

"resurrect the less pleasant" aspects of a case "in minute detail" because the Hyde Amendment "is meant to trigger a very specific inquiry, rather than a general referendum on the conduct of the prosecution team in a given case"). Simply put, there is no evidence of the sort of maliciousness required to find that this case was vexatious or in bad faith. *See United States v. Gomez*, No. EP-10-CR-1326-KC, 2012 WL 2899715, at *5 (W.D. Tex. July 9, 2012) (refusing to find that a prosecution was in bad faith because there was no evidence that the government's alleged failures to properly investigate the case based on its mistakes and erroneous assumptions were "because of personal animus or conscious wrongdoing on the part of prosecutors"). The Court agrees with many of Oz's criticisms of the Government's judgment and performance throughout this prosecution, but these short-comings are not evidence of the sort of subjective dishonesty or moral obliquity that would allow for a Hyde Amendment award. *See United States v. Erwin*, No. CR-08-33-FHS, 2010 WL 1816349, at *4 (E.D. Okla. May 3, 2010) ("while these arguments address a prosecution which is riddled with poor judgment and evaluation, they are not linked to conduct on the part of the government which can be classified as the conscious doing of a wrong because of dishonest purpose or moral obliquity" (citation omitted)).

### C. Frivolous Prosecution

Oz contends that the Government's prosecution was frivolous. (*See* Oz's Mem. in Supp. at 10–19; Oz's Reply at 9–32.) As evidence, Oz highlights the following: (1) the Government's alleged failure to establish probable cause before the grand jury, especially given the limited and weak evidence related to Oz's intent and knowledge available at the

time; (2) the Government's flawed legal theories regarding the intent elements for the crimes charged, which were largely rejected by the Court; and, (3) the Government's failure to introduce much of the weak and circumstantial evidence against Oz—especially regarding intent—at trial, which ultimately necessitated his acquittal on a Rule 29 motion.

A prosecution is frivolous if it is "utterly without foundation in law or fact," which requires the Court to consider "the legal merit to a prosecution." *Monson*, 636 F.3d at 440. "A frivolous position is one lacking a reasonable legal basis or where the government lacks a reasonable expectation of attaining sufficient material evidence by the time of trial." *Heavrin*, 330 F.3d at 729. Unlike vexatiousness or bad faith, frivolousness does not require that the Government have an improper motivation behind its prosecution. *See Bowman*, 380 F.3d at 390–91; *Manzo*, 712 F.3d at 811. However, the fact remains that mistakes and carelessness do not amount to a frivolous prosecution. *See Monson*, 636 F.3d at 439; *Capener*, 608 F.3d at 402.

The parties vehemently dispute whether the Government ever had evidence that warranted indicting Oz, and assuming that it did, whether the Government should have known that such evidence was inadmissible or insufficient to convict him. As previously discussed, the Court found that much of the Government's evidence was inadmissible at trial, necessitating Oz's acquittal. *See supra* Part II.C. However, the fact that Oz was acquitted and much of the Government's evidence was excluded does not mean a Hyde Amendment fee award is warranted. *See United States v. Isaiah*, 434 F.3d 513, 521 (6th Cir. 2006) (holding that the government's prosecution was not frivolous despite the fact

that the defendant was acquitted under Rule 29 because the government's circumstantial evidence of reckless indifference did not satisfy the specific intent elements of the crimes charged). Instead the question is whether the Government's prosecution was "utterly without foundation in law or fact." *Monson*, 636 F.3d at 440.

In considering the legal merits of the Government's prosecution of Oz, the Court has carefully examined the voluminous record. The Government's evidence against Oz, especially on the issue of intent, was entirely circumstantial—there was no direct evidence demonstrating that Oz knew RXL was operating in violation of the standards set by the FDCA or CSA. Instead, the Government relied on circumstantial evidence that Oz knew about the volume of drugs being dispensed through RXL, that some doctors were writing dozens or hundreds of prescriptions a day, and that some groups and individuals (e.g., family members of customers who abused drugs they received through RXL, shippers, and various state regulators) believed RXL was operating outside the law. The Government was entitled to rely on circumstantial evidence to prove its case. *See United States v. Idriss*, 436 F.3d 946, 950 (8th Cir. 2006) ("The government need not prove intent directly and can often prove intent by circumstantial evidence."). However, the evidence was insufficient to convict Oz—especially when much of it was not competent evidence and was excluded at trial. More experienced prosecutors likely would have recognized this fact, but this does not mean the Government's prosecution was frivolous. *See Isaiah*, 434 F.3d at 519–20

Rather than address each dispute regarding the sufficiency of the evidence, the Court focuses on the evidence of intent needed to convict Oz on the CSA charges. The

problems with the Government's evidence and arguments on this specific element offer insight into the mistakes and miscalculations that plagued this case. However, it also exemplifies why this prosecution cannot be classified as frivolous.

### 1. The Government's Flawed Legal Theory On Intent

As previously described, the Government apparently operated under the mistaken belief that it merely had to prove that Oz knew RXL distributed Fioricet to satisfy the CSA's intent element. *See supra* Part II.B. This prosecutorial misjudgment does not satisfy the high standard for an award of fees under the Hyde Amendment. *See Erwin*, 2010 WL 1816349 at *4 ("It is certainly true that prosecutorial judgment and discretion might have been exercised differently in other hands, but that factor alone does not equate with a finding of frivolous or vexatious conduct sufficient to entitle Defendant to fees under the Hyde Amendment."). Rather the question is whether the Government's position was "utterly without foundation in law . . . ." *Monson*, 636 F.3d at 440.

The Government's legal theory on intent, while incorrect and based on little precedential support, was not utterly unreasonable or without any legal footing. *See Heavrin*, 330 F.3d at 729 ("The government should be allowed to base a prosecution on a novel argument, so long as it is a reasonable one, without fear that it might be setting itself up for liability under the Hyde Amendment. Just because the government lacks 'precedent' does not automatically mean that its position is frivolous."). This is especially true given the apparent confusion created by the Exempting Regulation as to Fioricet's status as a controlled substance, which may explain why the Government took the position it did. *See supra* Part II.B; *United States v. Pocklington*, 831 F.3d 1186, 1189

(9th Cir. 2016) ("We decline to assess fees against the government for testing an essentially untested legal idea."); *Ali*, 2008 WL 4773422 at \*12 ("The government may have tested the outer bounds of the legal space that remained in the wake of the shoddy drafting of the reporting statute and its 'clarifying' regulations, but its aggressive theory cannot be said to have been obviously wrong at the outset."). Moreover, the Government abandoned its position after the Court's adverse ruling and ultimately dismissed the CSA charges against Oz about a month later. *See Ali*, 2008 WL 4773422 at \*14 ("an aggressive adherence to an ultimately unsuccessful theory is not enough [to find the prosecution was frivolous], especially considering that the theory, once revealed as legally wanting by the Court . . . was abandoned").

## 2. The Government's Weak Evidence of Intent

The Government contends that it properly relied on circumstantial evidence showing that Oz knew—or was willfully blind to the fact—that RXL sold Fioricet, a controlled substance. (*See* Gov't's Mem. in Opp. at 25–27.) For instance, the Government points to emails where Oz[4] explicitly discusses the sale of butalbital with various prescribing doctors. (*See* Gov't's Index of Exs. [Doc. No. 990], Ex. L at 1, 4[5] ("Oz-Doctor Correspondence") [Doc. No. 990-12].) Many other emails show that Oz

---

[4] The emails are signed "Ron" and came from an email account associated with RXL. There was some evidence that Oz went by "Ron" when working for RXL and that he used the email address in question. However, there was also evidence that RXL employees sometimes used each other's aliases interchangeably and that multiple people had access to the email account in question.

[5] For all exhibits, the Court cites to the page numbers as they appear in the exhibit itself.

knew RXL was selling Fioricet.  The Court agrees that the Government could properly rely on this evidence to conclude that Oz knew RXL distributed Fioricet/butalbital.[6]

However, as previously explained, this evidence alone did not satisfy the CSA's intent element.  *See supra* Part II.B.  The Government also had to prove that Oz knew, or should have known, that Fioricet/butalbital was a controlled substance.  *See id.*  Although some circumstantial evidence of this knowledge existed, it was very weak.  For instance, the Government relied on a series of emails from Oz to prescribing doctors in which he claimed that RXL did not sell controlled substances and offered to send the doctors the DEA's controlled substances schedules.[7]  (*See* Oz-Doctor Correspondence at 9–10.)  The Government reasons that since Oz knew RXL sold butalbital, and butalbital is listed as a controlled substance,[8] the fact that Oz was generally familiar with the controlled

---

[6] As Oz points out, however, the Government either failed to introduce much of Exhibit L at trial due to a myriad of evidentiary issues, or declined to offer portions of those emails at all.  Presumably the Government did not offer some of the emails because they could be seen as exculpatory.  For instance, in addressing one doctor's concerns that a patient had placed two orders for the same medication just days apart (suggesting abuse), Oz replied "there is no need to explain or feel uncomfortable if you think there is an order you shouldn't approve, this is the reason you are the M.D. and I am the Ops manager . . . ."  (Oz-Doctor Correspondence at 5.)  Oz went on to say that the order could be held for a week or two or given to another doctor, and that Oz could look at the records to see if there was some other explanation for the "double order" (e.g., that the first order arrived damaged and was returned, or that a computer glitch caused two orders to be placed).  (*Id.*)  Oz concluded by saying that RXL would accept the doctor's decision whether to approve the order or not.  (*Id.*)

[7] Again, the Government did not offer or was unsuccessful in introducing much of this evidence at trial.

[8] Recall that Fioricet and butalbital are not actually listed on Schedule III.  *See supra* Part II.B.  Instead, derivatives of barbituric acid are listed and butalbital is such a derivative.  *See id.*  It is questionable whether someone like Oz, with no medical training, would

substances lists means that he knew, or should have known, that RXL sold a controlled substance.[9]  (*See* Gov't's Mem. in Opp. at 25–26.)  Of course, several of these doctors also told Oz that they did not believe RXL was distributing controlled substances.  (*See, e.g.,* Oz-Doctor Correspondence at 8, 12.)  One of Oz's alleged co-conspirators, Dr. Onochie Aghaegbuna, testified at trial that during his time as a prescribing doctor for RXL, he did not believe Fioricet was a controlled substance and that he confirmed Oz's belief that RXL did not sell controlled substances.  (Trial Tr. Vol. VII dated 2/17/2017 at 1050, 1056, 1062–63 [Doc. No. 1008].)  The DEA's own investigators were apparently confused about whether butalbital was a controlled substance.  (*See, e.g.,* Gov't's Index of Exs., Exs. D at 1, 3 [Doc. No. 990-4] (containing the DEA's investigation report of a pharmacy that filled prescriptions for RXL wherein the investigator concluded that the prescriptions, including those for butalbital, were for non-controlled substances); Aff. of Robert D. Richman [Doc. No. 952], Ex. Q at 4 [Doc. No. 952-17] (containing a legal opinion authored by the DEA that concluded that although distribution of Fioricet was subject to the criminal provisions of the CSA, the Exempting Regulation "is likely to cause some confusion" and noting that "this matter is far from settled").)

_____

know that butalbital was a derivative of barbituric acid, which was listed as a controlled substance.

[9] The Court does not suggest that this was the only evidence the Government relied on to conclude that Oz knew Fioricet was a controlled substance.  (*See* Gov't's Mem. in Opp. at 26 (highlighting other evidence it claims supports its position that Oz had the requisite mens rea).)  However, as Oz points out, this additional evidence suffered from similar admissibility issues and also often contained exculpatory evidence.  (*See* Oz's Reply at 22–23.)

The weak and circumstantial nature of what limited evidence the Government was able to admit at trial required that this Court grant Oz's Rule 29 motion. Although more experienced prosecutors may have identified these evidentiary short-comings and made different tactical decisions, both in the investigation and at trial, this does not mean the case was frivolous. *See Manfredi*, 2008 WL 686859 at *8 ("Although the strength of the government's case may have been assessed differently if a seasoned prosecutor had been the lead attorney, the evidence in the record was sufficient to initially sustain prosecution."). Similarly, the fact that much of this evidence was not admitted at trial does not classify this prosecution as frivolous. *See Erwin*, 2010 WL 1816349 at *3 (declining to find the government's case was frivolous despite the defense counsel's "vigorous and skillful" exposure of the "weaknesses and inconsistencies" in the government's case); *United States v. Sherburne*, 249 F.3d 1121, 1127 (9th Cir. 2001) ("The trial process is fluid and involves multiple strategic and evidentiary decisions, many of which cannot be predicted at the outset, and many of which depend on contested evidentiary and other trial rulings—not to mention the uncertainties associated with witnesses' testimony. The trial process also implicates judgment, strategy and prosecutorial discretion. This is not to say that prosecutors may operate without limits, but simply that the test for awarding fees under the Hyde Amendment should not be an exercise in 20/20 hindsight based solely on reasonableness."). The Government's case against Oz was weak, but not utterly without basis in law or fact. *See Gomez*, 2012 WL 2899715 at *6 ("In sum, the government's case was weak, but not so weak that the government's position lacked probable cause or was groundless in law or fact.").

## IV. CONCLUSION

An acquitted defendant like Oz faces an onerous burden when trying to recover the fees he spent defending against a failed prosecution. Prosecutorial mistakes, carelessness, and even poor judgment do not suffice. Instead, there must be evidence that the prosecution was vexatious, frivolous, or in bad faith. This is the standard set by Congress, which the Court has dutifully applied here. Furthermore, the Court must be restrained in judging the executive branch's decision to prosecute a particular case. *Town of Newton v. Rumery*, 480 U.S. 386, 396 (1987) (holding that courts "normally must defer to prosecutorial decisions as to whom to prosecute" because such decisions "are not readily susceptible to the kind of analysis the courts are competent to undertake" (citations omitted)). The Court is keenly aware of the hardships this case imposed on Oz, but that fact alone does not make this prosecution frivolous, vexatious, or in bad faith and thus he is not entitled to a Hyde Amendment award.

## V. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant Moran Oz's Motion for Attorney's Fees and Expenses Under the Hyde Amendment [Doc. No. 947] is **DENIED**.


Dated: August 17, 2017

<u>s/ Susan Richard Nelson</u>
SUSAN RICHARD NELSON
United States District Judge

26